UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

ANTHONY ZIEBRON and JAMES VRANA,
individually and behalf of ALL OTHERS
SIMILARLY SITUATED,

    Plaintiffs,

v.

METALDYNE CORPORATION, *et al.*,

    Defendants.
_____/

Case No. 09-10164

Hon. John Corbett O'Meara

## OPINION AND ORDER GRANTING
## DEFENDANTS' MOTION TO DISMISS

Before the court is Defendants' motion to dismiss, filed June 4, 2010. Plaintiffs filed a response on July 19, 2010. Defendants submitted a reply on August 2, 2010. The court heard oral argument on September 23, 2010, and took the matter under advisement.

## BACKGROUND FACTS

Plaintiffs filed their proposed class action complaint on January 14, 2009, against Defendants Metaldyne Corporation, Heartland Industrial Partners LP, Heartland Industrial Associates, LLC; Gary M. Banks, Charles E. Becker, Cynthia Hess, Timothy Leuliette, Jeffrey Stafeil, David A. Stockman, Daniel P. Tredwell, and Samuel Valenti III. Plaintiffs allege the following causes of action: Count I, violation of section 10(b) of the Exchange Act and Rule 10b-5; Count II, violations of section 20(a) of the Exchange Act (against the individual defendants); Count III, breach of fiduciary duty (against the individual defendants and Heartland); Count IV, unjust enrichment (against the individual defendants and Heartland);

Count V, silent fraud (against the individual defendants and Heartland); and Count VI, conversion (against Metaldyne). Metaldyne is in bankruptcy; Plaintiffs voluntarily dismissed it from this action on February 12, 2010. Plaintiffs have filed a motion for class certification, but the parties agreed that motion would be held in abeyance until the court ruled upon the motion to dismiss.

Metaldyne was formed on November 28, 2000, when MascoTech, Inc., merged with Riverside Company, LLC. Heartland, a private equity firm, formed Riverside for the purpose of acquiring MascoTech. Heartland was the sole member of Riverside and, Plaintiffs contend, controlled Metaldyne after the merger.

Plaintiffs are former MascoTech employees who owned MascoTech stock. To facilitate the merger, holders of MascoTech restricted stock, including Plaintiffs, were issued "Substitute" awards in Metaldyne restricted stock. The first installment of the Substitute awards vested on November 28, 2000, the date of the merger. The remaining installments vested on January 14, 2002, 2003, and 2004. Before each of these dates, Plaintiffs could elect to receive the installment in stock, cash, or a combination. Plaintiff Ziebron elected to receive stock for the years 2002, 2003, and 2004. Plaintiff Vrana elected stock for the year 2002. Plaintiffs contend that, if Defendants had adequately disclosed certain information about a monitoring agreement between Metaldyne and Heartland, which they contend created a conflict of interest, they would have taken cash instead of stock for the years in question.

It is undisputed that Plaintiffs received certain information before making their elections. In their Complaint, Plaintiffs acknowledge that they received Metaldyne's 2000 Form 10-K, issued March 21, 2001, prior to their 2002 election. Compl. at ¶¶ 41-42. The Form 10-K

referred investors to a proxy statement issued on April 22, 2001. Defs.' Ex. B; Compl. at ¶ 42.

The proxy statement contained the following disclosure:

> MONITORING AGREEMENT
>
> We [Metaldyne] and Heartland are parties to a Monitoring Agreement pursuant to which Heartland is engaged to provide consulting services to us with respect to financial and operational matters. Heartland will receive a fee of $4.0 million for such services in fiscal year 2001, plus reimbursement for expense. Approximately $333,000 was accrued in 2000 (and paid in 2001) under this agreement. After 2001, Heartland will receive a fee for such services equal to the greater of (1) $4.0 million or (2) 0.25% of our total assets. In addition to providing ongoing consulting services, Heartland will also assist in acquisitions, divestitures and financings, for which Heartland will receive a fee equal to 1% of the value of such transaction. (sic) The monitoring agreement also provides that Heartland will be reimbursed for its reasonable out-of-pocket expenses. In 2000, we paid Heartland approximately $24.0 million in fees and reimbursed it for its expenses in connection with the recapitalization and the acquisition of Simpson.

Defs.' Ex. B.[1]

Prior to their 2003 election, Plaintiffs received Metaldyne's 2001 Form 10-K, issued March 28, 2002. Compl. at ¶ 42. The 2001 10-K contained the following disclosure:

> RELATED PARTY TRANSACTIONS
>
> In November 2000, we were acquired by an investor group led by Heartland Industrial Partners, L.P., ("Heartland") and Credit Suisse First Boston ("CSFB") in a recapitalization transaction.

---

[1] In a securities fraud action, a court "may consider the full text of SEC filings, prospectuses, analysts' reports and statements integral to the complaint, even if not attached," without converting the motion into one for summary judgment. In re Compuware Sec. Litig., 301 F. Supp.2d 672, 682 (E.D. Mich. 2004) (citations omitted). Further, "courts have recognized the SEC website as a 'recognized channel of distribution,' and have charged investors with knowledge of documents posted there." In re Keyspan Corp. Sec. Litig., 383 F. Supp.2d 358, 374 (E.D. N.Y. 2003).

> Heartland is a private equity fund established to "buy, build and grow" industrial companies in sectors with attractive consolidation opportunities. We believe the recapitalization and Heartland's investment in us will allow us to aggressively pursue internal growth opportunities and strategic acquisitions and to increase the scale and profitability of our businesses. In addition, the Company entered into a monitoring agreement with Heartland for an annual fee of $4 million plus additional fees for financings and acquisitions under certain circumstances. Total fees paid to Heartland in 2001 were approximately $4 million. The Heartland monitoring agreement is based on a percentage of assets calculation and Heartland has the option of taking the greater of the calculated fee or $4 million.

Defs.' Ex. E.

Prior to the January 14, 2004 vesting date, Plaintiffs acknowledge that they received Metaldyne's 2002 Form 10-K, issued on March 13, 2003. <u>See</u> Defs.'s Ex. J; Compl. at ¶ 42. This 10-K contained the following disclosure:

> RELATED PARTY TRANSACTIONS
>
> * * *
>
> The Company maintains a monitoring agreement with Heartland for an annual fee of $4 million plus additional fees for financings and acquisitions under certain circumstances. The Heartland monitoring agreement is based on a percentage of assets calculation and Heartland has the option of taking the greater of the calculated fee (which would have totaled $6.2 million for 2002) or $4 million. Total monitoring fees paid to Heartland in 2002 were $4 million. Additionally, the Company recorded $0.7 million in 2002 for expense reimbursements to Heartland in the ordinary course of business, $0.3 million of which is recorded as accounts payable in the Company's consolidated balance sheet for the year ended December 29, 2002.

Defs.' Ex. J.

Further, Defendants point to eight additional disclosures of the Monitoring Agreement between Heartland and Metaldyne in public filings between December 27, 2000, and April 22,

2003. See Defs.' Br. at 6; Defs.' Exs. A-K (registration statements, proxy statement, annual reports, and prospectuses). Plaintiffs contend that the disclosures were "buried" within the public filings and did not provide adequate information.

## LAW AND ANALYSIS

### I. Standard of Review

Defendants seek dismissal of complaint pursuant to Rule 12(b)(6). In analyzing such a motion, the court must "accept all the ... factual allegations as true and construe the complaint in the light most favorable" to the plaintiff. Gunasekera v. Irwin, 551 F.3d 461, 466 (6th Cir. 2009). To survive a motion to dismiss, the plaintiff must allege facts that, if accepted as true, are sufficient "to raise a right to relief above the speculative level" and to "state a claim to relief that is plausible on its face." Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 550 (2007). See also Ashcroft v. Iqbal, 129 S.Ct. 1937, 1949-50 (2009). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Iqbal, 129 S.Ct. at 1949. See also Hensley Mfg. v. ProPride, Inc., 579 F.3d 603, 609 (6th Cir. 2009).

### II. Securities and Exchange Act Claims: 10(b) and Rule 10b-5

Section 10(b) of the Securities and Exchange Act and Rule 10b-5 "prohibit fraudulent, material misstatements in connection with the sale or purchase of a security." Indiana State Dist. Council of Laborers and Hod Carriers Pension and Welfare Fund v. Omnicare, Inc., 583 F.3d 935, 942 (6th Cir. 2009) (citations omitted). A private right of action for violations exists where the plaintiff can demonstrate the following: "(1) a material misrepresentation or omission by the defendant; (2) scienter; (3) a connection between the misrepresentation or omission and the

purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation." Id. (citing Stoneridge Inv. Partners, LLC v. Scientific-Atlanta, 552 U.S. 148 (2008)). Further, as the Sixth Circuit has explained,

> Because § 10(b) claims sound in fraud, the pleading strictures of Federal Rule of Civil Procedure 9(b) apply. Thus, the complaint must "(1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent."
>
> Bolstering this rule of specificity the PSLRA imposes further pleading requirements. First, the complaint must "specify each statement alleged to have been misleading" along with "the reason or reasons why the statement is misleading." Second, plaintiffs must "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind."

Id. (citations omitted).

Defendants argue that Plaintiffs cannot identify a material misrepresentation or omission, because the Monitoring Agreement was repeatedly disclosed in various public filings. See Ley v. Visteon Corp., 543 F.3d 801, 807-809 (affirming dismissal of § 10(b) claim where the defendant made disclosures). Plaintiffs contend that Defendants' disclosures were "buried" in the late pages of the public filings, were unclear, and were incomplete. Specifically, Plaintiffs assert that the terms "monitoring agreement" and "transaction fee" were not defined. See Pls.' Resp. at 7-8.

"Under the 'buried facts' doctrine, a disclosure is deemed inadequate if it is presented in a way that conceals or obscures the information sought to be disclosed. The doctrine applies when the fact in question is hidden in a voluminous document or is disclosed in a piecemeal fashion which prevents a reasonable shareholder from realizing the 'correlation and overall

import of the various facts interspersed throughout' the document." Werner v. Werner, 267 F.3d 288, 297 (3d Cir. 2001). A review of Metaldyne's public filings demonstrates that disclosure of the Monitoring Agreement was not "buried." Although the disclosure appeared near the end of the filings, it appeared under a heading in a contiguous paragraph. The existence of the agreement between Metaldyne and Heartland, including the amount of fees paid to Heartland, was disclosed. Plaintiffs do not identify any additional facts that they believe should have been disclosed that were not. Further, the mere placement of the disclosure near the end of the filings does not render it "buried." Indeed, "every fact cannot be contained in the beginning" of an SEC filing. Valley Nat'l Bank of Ariz. v. Trustee for Westgage-California Corp., 609 F.2d 1274, 1282 (9th Cir. 1979) (citation omitted). See also Olkey v. Hyperion 1999 Term Trust, Inc., 98 F.3d 2, 5 (2d Cir. 1996) (affirming dismissal of securities fraud claims where "the plaintiffs' claims are contradicted by the disclosure of risk made on the face of each prospectus"); Kas v. Financial General Bankshares, Inc., 796 F2d 508, 515 (D.C. Cir. 1986) (affirming dismissal of securities fraud claim where the plaintiff's "claims of nondisclosure fade upon even a cursory examination of the proxy statement").

Plaintiffs additionally complain that Defendants (1) "compromised" the equipment maintenance system; (2) "discontinued long-successful machining programs"; (3) "terminated valuable employees"; and (4) changed the company's accounting system to a corporate-controlled model. Compl. at ¶¶ 46-48. To the extent Plaintiffs rely upon these allegations, they fall into the category of "corporate mismanagement" and cannot support a section 10(b) claim. See Marsh v. Armada Corp., 533 F.2d 978, 986 (6th Cir. 1976) (section 10(b) does not regulate "corporate mismanagement"); In re Winn-Dixie Stores, Inc. Sec. Litig., 531 F. Supp.2d 1334,

1345 (M.D. Fla. 2007) ("Several cases have discussed the duty to disclose mismanagement and have determined that corporate officers do not have a duty to disclose internal management problems to shareholders.") (citing cases).

Plaintiffs further allege violations of Generally Accepted Accounting Practices ("GAAP"), which they contend "bolsters" their section 10(b) claim. The "failure to follow GAAP is, by itself, insufficient to state a securities fraud claim." In re Comshare, Inc. Sec. Litig., 183 F.3d 542, 553 (6th Cir. 1999).

Because Plaintiffs have failed to identify a material misrepresentation or omission, they cannot state a section 10(b) claim. Accordingly, the court will dismiss Count I of the complaint.

### III.    Section 20(a) Claims

Count II of the Complaint asserts claims under section 20(a) of the Securities and Exchange Act against the individual defendants. Because Plaintiffs fail to state an underlying 10(b) violation, the section 20(a) claims must also be dismissed. See Ley v. Visteon Corp., 543 F.3d 801, 818 (6th Cir. 2008) (holding the plaintiffs could not state a section 20(a) claim against the individual defendants where "there is no predicate violation of the securities laws").

### IV.    State Law Claims

Plaintiffs also assert state law claims for breach of fiduciary duty, unjust enrichment, and silent fraud.

#### A.    Silent Fraud

To state a claim for silent fraud under Michigan law, Plaintiffs must allege, among other elements, that Defendants failed to disclose material facts that they had a duty to disclose. See M & D, Inc. v. W.D. McConkey, 231 Mich. App. 22, 28 (1998). In support of this claim,

Plaintiffs allege that Defendants failed to adequately disclose the Monitoring Agreement and conflict of interest. As the court has found, however, Defendants did adequately disclose this information in Metaldyne's public SEC filings. Accordingly, because Plaintiffs cannot allege a material misrepresentation or omission, Plaintiffs cannot state a claim for silent fraud.

### B. Unjust Enrichment and Breach of Fiduciary Duty

Defendants contend that Plaintiffs cannot demonstrate standing to pursue their unjust enrichment and breach of fiduciary duty claims, which they argue are derivative in nature, because they are no longer shareholders. "To have standing to maintain a shareholder derivative suit, a plaintiff must be a shareholder at the time of the filing of the suit and must remain a shareholder throughout the litigation." Kramer v. Western Pac. Indus. Inc., 546 A.2d 348, 354 (Del. 1988).[2]

The court concludes that Plaintiffs' claims are derivative in nature. Plaintiffs seek to redress an alleged harm to the corporation, rather than to shareholders as individuals. See id. at 353. The essence of Plaintiffs' claims is that the Monitoring Agreement "diminish[ed] the value of the Company" by paying Heartland "millions of dollars in monitoring fees" and that it would be "unjust" for Defendants to retain such fees, which should be "disgorged" and returned to the company. Compl. at ¶¶ 68, 73. "A claim of mismanagement resulting in corporate waste, if proven, represents a direct wrong to the corporation that is indirectly experienced by all

---

[2] The parties agree that the law of the state of Metaldyne's incorporation, Delaware, applies to these claims. See Stewart v. Geostar Corp., 2008 WL 1882698 at *4 (E.D. Mich. Apr. 24, 2008) ("This conclusion comports with the internal affairs doctrine, which is a choice of law principle that the law of the state of incorporation generally governs issues pertinent to a corporation's internal affairs.").

shareholders. Any devaluation of stock is shared collectively by all the shareholders, rather then independently by the plaintiff or any other individual shareholder. Thus, the wrong alleged is entirely derivative in nature." Id. See also Agostino v. Hicks, 845 A.2d 1110, 1123 (Del. Ch. 2004) ("[T]he nature of this claim is nothing more than a claim of mismanagement that, 'if proven, represents a direct wrong to the corporation that is indirectly experienced by all shareholders.'").[3]

Because Plaintiffs' claims are derivative, they lack standing to assert them. Accordingly, the court will dismiss Plaintiffs' breach of fiduciary duty and unjust enrichment claims.

**ORDER**

IT IS HEREBY ORDERED that Defendants' motion to dismiss is GRANTED and the complaint is DISMISSED.

                                               s/John Corbett O'Meara
                                               United States District Judge

Date: September 28, 2010

I hereby certify that a copy of the foregoing document was served upon the parties of record on this date, September 28, 2010, using the ECF system and/or ordinary mail.

                                                 s/William Barkholz
                                                 Case Manager

---

[3] Plaintiffs suggest that a so-called "unjust enrichment exception" should apply here, citing Agostino. Plaintiffs do not, however, explain what the contours are of the exception and why it should apply under the circumstances in this case. Further, the court in Agostino declined to apply the "limited" exception in the corporate context, so that case is of no assistance to Plaintiffs. See Agostino, 845 A.2d at 1125-26 ("I similarly decline to expand *Cencom* [a partnership case] into the corporate context because once such a step is made, any attempt by later courts to limit the 'unjust enrichment exception' would only add to the confusing ambiguities surrounding the direct/derivative distinction.").